ZBIGNIEW SZEWCZYK *v.* DEPARTMENT
OF SOCIAL SERVICES
(SC 17034)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued February 8—officially released September 20, 2005

*Thomas J. Riley*, for the appellant (substitute plaintiff).

*Tanya Feliciano DeMattia*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Richard J. Lynch*, assistant attorney general, for the appellee (defendant).

*Jennifer L. Cox, Jennifer A. Osowiecki* and *Patrick J. Monahan II* filed a brief for the Connecticut Hospital Association as amicus curiae.

*Sheldon V. Toubman, Jamey Bell, Angel Feng, Greg Bass* and *Shirley Bergert* filed a brief for the Connecticut Legal Services, Inc., et al., as amici curiae.

*Opinion*

NORCOTT, J. The principal issue in this certified appeal is whether an illegal alien with acute myelogenous leukemia suffers from an "emergency medical condition" under the federal statute, 42 U.S.C. § 1396b (v),[1] and the state regulation, Department of Social Services, Uniform Policy Manual § 3000.01 (Uniform Policy Man-

---

[1] Title XIX of the Social Security Act, 42 U.S.C. § 1396b (v), provides: "(1) Notwithstanding the preceding provisions of this section, except as provided in paragraph (2), no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.

"(2) Payment shall be made under this section for care and services that are furnished to an alien described in paragraph (1) only if—

"(A) such care and services are necessary for the treatment of an emergency medical condition of the alien,

"(B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this subchapter [42 U.S.C. § 1396 et seq.] (other than the requirement of the receipt of aid or assistance under subchapter IV [42 U.S.C. § 601 et seq.], supplemental security income benefits under subchapter XVI [42 U.S.C. § 1381 et seq.], or a State supplementary payment), and

"(C) such care and services are not related to an organ transplant procedure.

"(3) For purposes of this subsection, the term 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

"(A) placing the patient's health in serious jeopardy,

"(B) serious impairment to bodily functions, or

"(C) serious dysfunction of any bodily organ or part."

ual),[2] and is, therefore, entitled to medicaid benefits. Michael R. Kerin, the temporary administrator of the estate of the plaintiff, Zbigniew Szewczyk,[3] appeals, following our grant of certification,[4] from the judgment of the Appellate Court concluding that the plaintiff did not suffer from an emergency medical condition, and affirming the judgment of the trial court dismissing his administrative appeal from the decision of the defendant, the department of social services (department), denying medicaid benefits to the plaintiff. *Szewczyk* v. *Dept. of Social Services*, 77 Conn. App. 38, 52, 822 A.2d 957 (2003). We conclude that the plaintiff suffered from an emergency medical condition. Accordingly, we reverse the judgment of the Appellate Court.

Chief Judge Lavery aptly set forth the facts and procedural history in his dissent from the Appellate Court opinion in this case. "The plaintiff, a native of Poland, illegally remained in this country after his visa expired. On November 24, 1998, the plaintiff sought treatment from his family physician. At that time, he suffered from

[2] Uniform Policy Manual, supra, § 3000.01, provides in relevant part: "Emergency Medical Condition

"A medical condition is considered an emergency when it is of such severity that the absence of immediate medical attention could result in placing the patient's health in serious jeopardy. This includes emergency labor and delivery, and emergencies related to pregnancy, but does not include care or services related to an organ transplant procedure."

Under Uniform Policy Manual, supra, § 3005.05 (C), "[a] non-citizen who does not fall into one of the categories listed in B is eligible for [medical care] only, if he or she has an emergency medical condition." It is undisputed that the plaintiff was not otherwise eligible for medical care under § 3005.05.

[3] The plaintiff died after the appeal had been filed. Thereafter, this court granted a motion to substitute Kerin, the temporary administrator of Szewczyk's estate, as plaintiff. For convenience sake, we refer herein to Szewczyk as the plaintiff.

[4] We granted the plaintiff's petition for certification limited to the following issue: "Did the Appellate Court improperly find that the plaintiff did not suffer from an emergency medical condition under the definition of that term as set forth in the department of social services Uniform Policy Manual?" *Szewczyk* v. *Dept. of Social Services*, 265 Conn. 903, 829 A.2d 421 (2003).

intense pain, nausea and overall weakness so severe that he could take only one to two steps before collapsing. After reviewing the results of tests performed on the plaintiff's blood samples, the plaintiff's physician immediately referred the plaintiff to Robert B. Erichson, an oncologist at Stamford Hospital (hospital).

"On that same day, Erichson diagnosed the plaintiff with acute myelogenous leukemia and admitted him to the hospital. The plaintiff received treatment consisting of chemotherapy, surgery and biopsies at the hospital until his discharge on December 26, 1998. The hospital charges from November 24 through December 26, 1998, totaled $82,046.85.[5]

"An application for benefits from November through December, 1998, was filed with the [department], an agency of the state. Erichson wrote a letter, which was admitted into evidence by the department's hearing officer, that stated that 'acute myelogenous leukemia . . . *is a rapidly fatal disease unless treated aggressively with chemotherapy.*' . . . Erichson also opined that such chemotherapy is always administered in a hospital, associated with severe infections requiring aggressive antibiotic and transfusion treatment, and that *'in the absence of such therapy,* [*the plaintiff*] *would probably not be alive today.*'[6] . . . Despite the absence of

---

[5] "If the department's hearing officer had determined that the plaintiff had been eligible for the benefits he attempted to obtain, the state would have been required to contribute $22,386.56." *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 53 n.1 (*Lavery, C. J.*, dissenting).

[6] "The complete text of the Erichson letter states: 'Regarding [the plaintiff] and his admission of 11/27/98 to 12/26/98. [The plaintiff] has acute myelogenous leukemia which is a rapidly fatal disease unless treated aggressively with chemotherapy. Such chemotherapy is always administered in the hospital and is almost always associated with severe infections, requiring aggressive antibiotic therapy, as well as an aggressive transfusion program, including packed cells and platelets. The duration of his hospitalization is standard for such therapy and, in the absence of such therapy, [the plaintiff] would probably not be alive today [June 7, 1999].' The date of admission appears to be in error in the letter, as all of the other evidence indicates that the plaintiff was admitted to the hospital on November 24, 1998."

any medical evidence to the contrary, the hearing officer determined that the plaintiff did not suffer from an emergency medical condition and therefore was not eligible for benefits. Specifically, the hearing officer found that the plaintiff did not suffer from an emergency medical condition because the plaintiff would not have immediately died on November 24, 1998, if he had not received treatment." (Emphasis in original.) Id., 53–54 (*Lavery, C. J.*, dissenting).

The plaintiff appealed from the denial of benefits to the trial court pursuant to General Statutes §§ 4-183 and 17b-61. The trial court applied the explanation of "emergency medical condition" from the decision of the United States Court of Appeals for the Second Circuit in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226, 232–33 (2d Cir. 1998), and cited another trial court case for the proposition that "an emergency is any condition that is of such severity that in the absence of immediate medical attention, the patient's health would be placed in serious jeopardy." (Internal quotation marks omitted.) The trial court credited the hearing officer's conclusions that the biopsy and catheterization were not " 'emergency events,' " and that the plaintiff " 'would not have immediately died' on the date of admission." The trial court concluded that these findings were supported by substantial evidence, and, therefore, dismissed the plaintiff's administrative appeal.

The plaintiff thereafter appealed from the judgment of the trial court to the Appellate Court. *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 38. The Appellate Court relied on the standards articulated in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 232, and concluded that the hearing officer did not use an inappropriately "narrow" legal

*Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 53–54 n.2 (*Lavery, C. J.*, dissenting).

standard. *Szewczyk* v. *Dept. of Social Services*, supra, 48. The Appellate Court also concluded that the hearing officer's decision was supported by substantial evidence, similarly crediting his determination that the biopsy and catheterization were not emergency procedures, and that the hearing officer's decision not to adopt Erichson's determination was a question of credibility that it would not disturb.[7] Id., 52. Accordingly, the Appellate Court affirmed the judgment of the trial court, and this certified appeal followed. See footnote 4 of this opinion.

On appeal, the plaintiff contends that the Appellate Court correctly relied upon, but misapplied, the Second Circuit's explanation of the term "emergency medical condition" from *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 233. The plaintiff also contends that the Appellate Court's improperly restrictive application of the term "emergency medical condition" will have dire consequences for patient care, and will interfere with hospitals' discharge of their patient care responsibilities under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.[8] Finally, the plaintiff claims that the hearing

---

[7] Chief Judge Lavery filed a dissenting opinion wherein he concluded that the majority, the trial court and the hearing officer had applied *Greenery Rehabilitation Group, Inc.*, too narrowly, and placed improper "emphasis on the factual finding that the plaintiff would not have immediately died on November 24, 1998, if he did not receive treatment." *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 59–60. Chief Judge Lavery stated that this emphasis on immediate death improperly added an element to the text of § 1396b (v) (3). Id., 60 (*Lavery, C. J.*, dissenting). He also wrote that the applicable state regulations evince the state's "elect[ion] to provide additional benefits to unlawful aliens and that the plaintiff is entitled to benefits under the state regulations, independent of the federal statute." Id., 61 (*Lavery, C. J.*, dissenting).

[8] The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, provides in relevant part: "(a) Medical screening requirement

"In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital

must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection [e] [1] of this section) exists.

"(b) *Necessary stabilizing treatment for emergency medical conditions and labor*

"(1) In general

"If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

"(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

"(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section. . . .

"(c) Restricting transfers until individual stabilized

"(1) Rule

"If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection [e] [3] [B] of this section), the hospital may not transfer the individual unless—

"(A) (i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

"(ii) a physician (within the meaning of [42 U.S.C. § 1395x (r) (1)]) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or . . . .

"(B) the transfer is an appropriate transfer (within the meaning of paragraph [2]) to that facility.

"A certification described in clause (ii) or (iii) of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

"(2) Appropriate transfer

"An appropriate transfer to a medical facility is a transfer—

"(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

"(B) in which the receiving facility—

"(i) has available space and qualified personnel for the treatment of the individual, and

"(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

"(C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for

## "emergency medical condition" was not supported by

which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1) (A), and the name and address of any on-call physician (described in subsection [d] [1] [C] of this section) who has refused or failed to appear within a reasonable time to provide necessary stabilizing treatment;

"(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; and

"(E) which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred. . . .

"(e) Definitions

"In this section:

"(1) The term 'emergency medical condition' means—

"(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

"(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

"(ii) serious impairment to bodily functions, or

"(iii) serious dysfunction of any bodily organ or part; or

"(B) with respect to a pregnant woman who is having contractions—

"(i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or

"(ii) that transfer may pose a threat to the health or safety of the woman or the unborn child. . . .

"(3) (A) The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph (1) (A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1) (B), to deliver (including the placenta).

"(B) The term 'stabilized' means, with respect to an emergency medical condition described in paragraph (1) (A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility, or, with respect to an emergency medical condition described in paragraph (1) (B), that the woman has delivered (including the placenta).

"(4) The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the

substantial evidence.[9] We agree with the plaintiff's contention that the Appellate Court improperly affirmed the judgment of the trial court because the hearing officer correctly relied upon, but misapplied, the standard set forth in *Greenery Rehabilitation Group, Inc.*

In the present case, the plaintiff concedes that there is no Connecticut law that provides broader health coverage to illegal aliens than that provided under federal law, and acknowledges that the definition of "emergency medical condition" in § 3000.01 of the Uniform Policy Manual is controlled by the coordinate federal statute. See, e.g., *Lewis* v. *Thompson*, 252 F.3d 567, 570 (2d Cir. 2001). Thus, in order to establish his eligibility for payments under § 3005.05 (C) of the Uniform Policy Manual, the plaintiff must establish that he suffered

hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person. . . .

"(h) No delay in examination or treatment

"A participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) of this section or further medical examination and treatment required under subsection (b) of this section in order to inquire about the individual's method of payment or insurance status. . . ."

[9] The plaintiff is supported by the amici curiae, who include Connecticut Legal Services, Inc., New Haven Legal Assistance Association, Inc., and Greater Hartford Legal Aid, Inc. (collectively, legal services), and the Connecticut Hospital Association (association). Legal services contends that the Appellate Court should not have followed the standard set forth in *Greenery Rehabilitation Group, Inc.*, because it is inconsistent with federal medicaid law as explained by the decisions of various state courts. The association contends that the Appellate Court properly followed, but gave an inappropriately restrictive application to the standard set forth in *Greenery Rehabilitation Group, Inc.* The association also endorses that portion of Chief Judge Lavery's dissent that reads the applicable state regulations as evincing the state's "elect[ion] to provide additional benefits to unlawful aliens and [stating] that the plaintiff is entitled to benefits under the state regulations, independent of the federal statute." *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 61. We need not address in detail the additional contentions of the amici because we agree with the plaintiff's claim that the trial court and the Appellate Court misapplied the standard set forth in *Greenery Rehabilitation Group, Inc.*

from an emergency medical condition as that term is defined in 42 U.S.C. § 1396b (v) (3), and also that he received treatment for the emergency medical condition within the meaning of 42 U.S.C. § 1396b (v) (2) (A).

We begin with the applicable standard of review. "In *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 669, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001), we stated: Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . We also have held that an exception is made when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . Accord *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, [232 Conn. 91, 109, 653 A.2d 782 (1995)] ([a]s we have stated many times, the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts . . . [however] it is for the courts, and not for administrative agencies, to expound and apply governing principles of law . . .)." (Internal quotation marks omitted.) *Wallingford* v. *Dept. of Public Health*, 262 Conn. 758, 771–72, 817 A.2d 644 (2003).

The construction and application of § 1396b (v) (3) presents an issue of law not heretofore considered by this court. Accordingly, our review is plenary. See, e.g., *Manifold* v. *Ragaglia*, 272 Conn. 410, 419, 862 A.2d 292 (2004). With respect to the construction and application of federal statutes, "principles of comity and consis-

tency" require us to follow the plain meaning rule for the interpretation of federal statutes "because that is the rule of construction utilized by the United States Court of Appeals for the Second Circuit."[10] *Webster Bank* v. *Oakley*, 265 Conn. 539, 554–55, 830 A.2d 139 (2003) (construing federal Americans with Disabilities Act and Fair Housing Amendments Act of 1988), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004). Moreover, it is well settled that "[t]he decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts."[11] Id., 555 n.16.

---

[10] We followed the plain meaning rule in *Webster Bank* v. *Oakley*, 265 Conn. 539, 55–56, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004), despite our contemporaneous renunciation of it in *State* v. *Courchesne*, 262 Conn. 537, 577–78, 816 A.2d 562 (2003), which had not yet been superseded by General Statutes § 1-2z, because "[t]he decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts . . . [and] that court's decisions may be more helpful to us if we follow the same analytical approach to federal statutory interpretation that it does." (Citation omitted.) *Webster Bank* v. *Oakley*, supra, 555 n.16, citing *Thomas* v. *West Haven*, 249 Conn. 385, 392, 734 A.2d 535 (1999) (considering 42 U.S.C. § 1983 claim in light of concurrent state and federal court jurisdiction), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000).

[11] We agree with the dissent's observation that, while persuasive, decisions of the Second Circuit are not necessarily *binding* upon us. See, e.g., *Turner* v. *Frowein*, 253 Conn. 312, 341, 752 A.2d 955 (2000). Departure from Second Circuit precedent on issues of federal law, however, should be constrained in order to prevent the plaintiff's decision to file an action in federal District Court rather than a state court located " 'a few blocks away' " from having the " 'bizarre' " consequence of being outcome determinative. *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992) (following Second Circuit's analysis for claim of substantive due process violation in land use cases under 42 U.S.C. § 1983 because it would be " 'bizarre' " for two courts located " 'a few blocks away' " to utilize different analyses); see also *DiMartino* v. *Richens*, 263 Conn. 639, 663 and n.17, 822 A.2d 205 (2003) (following federal cases requiring independent review of trial court and jury findings that government employee's speech was protected under first amendment and noting that Second Circuit cases are " 'particularly persuasive' "); *Turner* v. *Frowein*, supra, 341 (following Second Circuit's construction of article 13b of Hague Convention on Civil Aspects of International Child Abduction and federal implementing legisla-

"Accordingly, our analysis of the federal statutes in the present case begins with the plain meaning of the statute. . . . If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole. . . . [*United States* v. *Ripa*, 323 F.3d 73, 81 (2d Cir. 2003)]; see also *In re Caldor Corp.*, 303 F.3d 161, 167–68 (2d Cir. 2002) ([a]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute . . .). Under the plain meaning rule, [l]egislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous. . . . *In re Venture Mortgage Fund, L.P.*, 282 F.3d 185, 188 (2d Cir. 2002). Thus, our interpretive process will begin by inquiring whether the plain language of [each] statute, when given its ordinary, common meaning . . . is ambiguous. . . . *In re Caldor Corp.*, supra, 168." (Internal quotation marks omitted.) *Webster Bank* v. *Oakley*, supra, 265 Conn. 555–56.

We note at the outset that the Second Circuit is the sole federal Court of Appeals to have considered § 1396b (v) (3). That court authoritatively construed § 1396b (v) (3) in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 233, and declared the statutory term "emergency medical condition" to be clear and unambiguous. We, therefore, need not reinvent the federal wheel, and turn to *Greenery Rehabilitation Group, Inc.*, for highly persuasive guidance respecting this issue from the federal Court of Appeals whose jurisdiction encompasses our state.[12] See footnote 11 of

tion); *Schnabel* v. *Tyler*, 230 Conn. 735, 743, 646 A.2d 152 (1994) (considering qualified immunity under 42 U.S.C. § 1983 and stating that "in applying federal law in those instances where the United States Supreme Court has not spoken, we generally give special consideration to decisions of the Second Circuit Court of Appeals").

[12] The dissent disagrees with the Second Circuit's application of the plain meaning rule in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 233, and states that it finds § 1396b (v) (3) ambiguous. The dissent

this opinion. In that case, the Second Circuit concluded that, "[t]he statutory language of 42 U.S.C. § 1396b (v) (3) is plain in its meaning. An 'emergency medical condition' must be manifested by acute, rather than chronic symptoms. It must necessitate immediate medical treatment, without which the patient's physical well-being would likely be put in jeopardy or serious physical impairment or dysfunction would result." *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 233.

In *Greenery Rehabilitation Group, Inc.*, the Second Circuit adopted the definition of " 'emergency' " from Webster's Third New International Dictionary and stated that "[i]n the medical context, an 'emergency' is generally defined as 'a sudden bodily alteration such as is likely to require immediate medical attention.' . . . The emphasis is on severity, temporality and urgency. We believe that 42 U.S.C. § 1396b (v) (3) clearly conveys this commonly understood definition." (Citation omitted.) Id., 232. The court further stated that "[a]n 'acute' symptom is a symptom 'characterized by sharpness or severity . . . having a sudden onset, sharp rise, and short course . . . [as] opposed to chronic.' . . . Moreover, as a verb, 'manifest' means 'to show plainly.' . . . In § 1396b (v) (3) this verb is used in the present progressive tense to explain that the 'emergency medical condition' must be revealing itself through acute symptoms. Thus . . . the statute plainly requires that the

then utilizes a variety of extratextual evidence relating both to § 1396b (v) (3) and the different EMTALA statute, § 1395dd (e) (1), to conclude that "an emergency medical condition is a condition that requires stabilizing treatment in order to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility or his discharge." As the concurring opinion points out, we do not write on a blank slate with respect to the construction and application of § 1396b (v) (3). Any disagreement by us with the Second Circuit's statutory analysis must yield to the more compelling objective of uniform interpretation of federal laws, particularly when the federal court has spoken *first*. See cases cited in footnote 11 of this opinion.

acute indications of injury or illness must coincide in time with the emergency medical condition. Finally, 'immediate' medical care means medical care 'occurring . . . without loss of time' or that is 'not secondary or remote.' . . . In sum, the statutory language unambiguously conveys the meaning that emergency medical conditions are sudden, severe and short-lived physical injuries or illnesses that require immediate treatment to prevent further harm."[13] (Citations omitted.) Id. Indeed, in determining that the federal regulation, 42 C.F.R. § 440.255,[14] or the legislative history do not require a different definition of the term "emergency medical condition," the court concluded that "our review of the plain meaning of § 1396b (v) (3) ends our inquiry." Id., 233.

In *Greenery Rehabilitation Group, Inc.*, the court applied this standard and concluded that three undocumented aliens who were residents of long-term nursing and rehabilitation centers did not suffer from "emer-

---

[13] The Second Circuit noted that the statutory definition of § 1396b (v) (3) "is also consistent with the general concept of a medical emergency as commonly understood by those in the medical professions." *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 232. It quoted Dorland's Medical Dictionary definition of "emergency" as " 'an unlooked for or sudden occasion; an accident; an urgent or pressing need.' " Id., quoting Dorland's Illustrated Medical Dictionary (28th Ed. 1994).

[14] The coordinate federal regulation, 42 C.F.R. § 440.255 (c), provides: "Effective January 1, 1987, aliens who are not lawfully admitted for permanent residence in the United States or permanently residing in the United States under the color of law must receive the services necessary to treat the condition defined in paragraph (1) of this section if—

"(1) The alien has, after sudden onset, a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:

"(i) Placing the patient's health in serious jeopardy;

"(ii) Serious impairment to bodily functions; or

"(iii) Serious dysfunction of any bodily organ or part, and

"(2) The alien otherwise meets the requirements in §§ 435.406(c) and 436.406(c) of this subpart."

gency medical conditions" under § 1396b (v). Id., 228–29, 233. The patients required rehabilitative care for severe head injuries that they had sustained as a result of trauma from an automobile accident and assaults. Id., 228–29. The court stated that treatment for the "patients' sudden and severe head injuries undoubtedly satisfied the plain meaning of § 1396b (v) (3). However, after the patients were stabilized and the risk of further direct harm from their injuries was essentially eliminated, the medical emergencies ended. This is not to say that the patients could not suffer from a true emergency medical condition while being cared for by [the rehabilitation centers]. For example, it seems clear that if one of these patients suffered a sudden heart attack, treatment to stabilize the patient would be covered by [m]edicaid pursuant to § 1396b (v) (3). However . . . such an occurrence would constitute an independent emergency and would not be considered a continuation of the emergency situation brought about by the initial head injury." Id., 232–33. The court further stated that, although two of the patients "undoubtedly require *ongoing maintenance care,* we have some doubt as to whether their health would be jeopardized by the absence of immediate medical attention . . . . In any event, however, it is clear that the *stable, long-term problems* suffered by [two of the immigrants] do not meet the additional, independent requirement that the medical condition be manifested by acute symptoms." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 233.

Several of our sister state courts have considered *Greenery Rehabilitation Group, Inc.,* as persuasive authority in determining the meaning of "emergency medical condition" under the plain language of § 1396b (v) (3). See, e.g., *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administra-*

*tion*, 206 Ariz. 1, 6–7, 75 P.3d 91 (2003);[15] *Luna* v. *Division of Social Services*, 162 N.C. App. 1, 11–13, 589 S.E.2d 917 (2004). We find especially persuasive a North Carolina appellate decision that is directly on point, namely, *Diaz* v. *Division of Social Services*, 166 N.C.

[15] We note that, in *Scottsdale Healthcare, Inc.*, the Arizona court criticized *Greenery Rehabilitation Group, Inc.*, as narrow and stated that "whether a patient suffers from an emergency medical condition does not depend upon the type of bed or facility the patient may be in at any given time. In addition, stability, in the sense that a patient can be transferred from an acute care bed, is not the sole or even primary criterion under the statute. Nor does the statute limit the determination of when an emergency medical condition has ended to whether the treating physician has a reasonable degree of confidence that the patient and his lay caregivers can manage his medical condition so that serious adverse consequences are not reasonably likely to occur . . . .

"Instead, the focus must be on whether the patient's current medical condition—whether it is the initial injury that led to admission, a condition directly resulting from that injury, or a wholly separate condition—is a non-chronic condition presently manifesting itself by acute symptoms of sufficient severity that the absence of immediate medical treatment could result in one of the three adverse consequences listed in § [1396b (v)]. If the resulting condition is manifested by chronic symptoms it is not an emergency medical condition. Whether a condition is manifested by acute symptoms or by chronic symptoms is a question of fact." (Internal quotation marks omitted.) *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, supra, 206 Ariz. 8.

After articulating its standard for "emergency medical condition" under § 1396b (v), the court remanded the case for a determination as to whether the patients at issue had such conditions. Id. The patients in *Scottsdale Healthcare, Inc.*, had been admitted to the hospital as a result of major traumas, and thereafter required longer-term intensive care, including feeding tubes and multiple surgeries, for lasting complications from their severe injuries. Id., 4 n.3.

We disagree with the Arizona court's criticism of *Greenery Rehabilitation Group, Inc.*, as unduly narrow and focused on stabilization. We do, however, agree with that court's observation that the plain language of § 1396b (v) (3) "does not focus solely on the condition of the patient at one instant in time. Instead, § [1396b (v)] takes a forward looking view asking whether 'the absence of immediate medical attention *could reasonably be expected* to result in' one of the three adverse consequences listed in the statute. The statute thus considers both the patient's current condition, that is whether the condition is presently manifested by acute symptoms, and how that current condition may affect the health of the patient in the days to come." (Emphasis in original.) Id., 8 n.9.

App. 209, 600 S.E.2d 877 (2004), review granted, 359 N.C. 320, 611 S.E.2d 409 (2005).[16] In *Diaz*, a biopsy performed on an undocumented alien suffering from sore throat, nausea, vomiting, bleeding gums and lethargy revealed that he had acute lymphocytic leukemia. Id., 210. He immediately received chemotherapy, sustained an infection requiring transfer to the intensive care unit, and subsequently was discharged from the hospital approximately one month after chemotherapy started. Id. He received subsequent "modules" of chemotherapy on a monthly basis for the next several months. Id. The division of social services approved medicaid coverage for the first several modules, but denied it with respect to the rest. Id., 211. The trial court concluded that the alien was entitled to "treatment for [his] emergency medical condition" with respect to *all* of the modules of chemotherapy. Id. The division of social services thereafter appealed, claiming that the "trial court erred by extending [m]edicaid benefits to [the] petitioner for the treatment of an emergency medical condition." Id.

The North Carolina Court of Appeals affirmed the judgment of the trial court, relying solely on the federal medicaid requirements and concluding that "medical care is necessary for the treatment of an emergency condition if the alien requires the care and services after the sudden onset of a medical condition (including

---

[16] The definition of "emergency medical condition" apparently has been a hotly contested issue in North Carolina. See *Diaz* v. *Division of Social Services*, supra, 166 N.C. App. 209; see also *Medina* v. *Division of Social Services*, 165 N.C. App. 502, 508, 598 S.E.2d 707 (2004) (remanding case for additional factual findings to determine whether "absence of immediate medical attention . . . could result in . . . health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part" when illegal immigrant had received chemotherapy for acute lymphoblastic leukemia); *Luna* v. *Division of Social Services*, supra, 162 N.C. App. 11–13 (remanding case for immigrant who suffered from non-Hodgkin's lymphoma).

labor and delivery) that manifests itself by acute symptoms of sufficient severity (including severe pain) . . . . These symptoms must be so severe that the absence of immediate medical attention could result in: (1) placing the patient's health in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part." (Citation omitted; internal quotation marks omitted.) Id., 213, citing *Medina* v. *Division of Social Services*, 165 N.C. App. 502, 508, 598 S.E.2d 707 (2004).[17]

The North Carolina court applied this standard and concluded that the petitioner was entitled to medicaid coverage for an "emergency medical condition." *Diaz* v. *Division of Social Services*, supra, 166 N.C. App. 216. It determined that, unlike in prior cancer cases, the trial court had made the requisite findings of fact to support its determination that the patient initially had arrived at the hospital with "acute symptoms" such as vomiting and lethargy, and that "absent medical treatment in the form of chemotherapy, [his] health would have been placed in serious jeopardy and he would have died." (Internal quotation marks omitted.) Id., 215–16.

Beyond the analysis of *Greenery Rehabilitation Group, Inc.*, we also note that the plain language of § 1396b (v) indicates that the statute encompasses pay-

---

[17] We find the North Carolina cases especially persuasive because of their consideration of *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 226. In *Medina* v. *Division of Social Services*, supra, 165 N.C. App. 508, which was cited in *Diaz* v. *Division of Social Services*, supra, 166 N.C. App. 209, the court relied on its analysis in *Luna* v. *Division of Social Services*, supra, 162 N.C. App. 11–12, which is the state's seminal case on the issue. In *Luna*, the court relied on the explanation of the term "acute symptoms" in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 232, but ultimately adopted the test set forth in *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, supra, 206 Ariz. 8, for determining the existence of an "emergency medical condition." *Luna* v. *Division of Social Services*, supra, 12–13; see also footnote 15 of this opinion.

ment for care beyond that which is immediately necessary to stabilize a patient. The statute permits payment for "care and services . . . necessary for the treatment of an emergency medical condition of the alien"; 42 U.S.C. § 1396b (v) (2) (A); so long as the alien is otherwise eligible and "such care and services are not related to an organ transplant procedure." 42 U.S.C. § 1396b (v) (2) (C). The proviso with respect to organ transplant procedures, which undoubtedly are time-consuming and entail relatively lengthy hospitalizations, presumably would be unnecessary if Congress had intended § 1396b (v) to apply only to short-term stabilization treatment, such as that which is required by EMTALA, 42 U.S.C. § 1395dd.[18] It is, of course, presumed, both by

---

[18] The plaintiff claims that the Appellate Court's ruling will affect patient access to emergency care adversely under EMTALA, 42 U.S.C. § 1395dd, which shares the same definition of "emergency medical condition" as is used in § 1396b (v). See 42 U.S.C. § 1395dd (e) (1) (A). Under EMTALA, adherence to which is a condition for hospitals participating in the medicare program, when any patient comes to a hospital emergency room, the hospital personnel first must screen him or her for the existence of an "emergency medical condition . . . ." 42 U.S.C. § 1395dd (a). The department, however, contends that EMTALA has no impact on payments made for care under § 1396b (v) because the statutes serve different purposes; § 1396b (v) is a cost cutting measure and a payment statute, while EMTALA is a treatment entitlement for limited conditions that was enacted to combat the problem of " 'patient dumping' . . . ."

Moreover, we find the dissent's extensive discussion of the history and subsequent administrative interpretations of EMTALA to be illuminating with respect to that statute, but of minimal import with respect to the construction of § 1396b (v). The dissent's discussion does not provide any insight with respect to the kind of emergency medical conditions that Congress intended would be subject to the specific statute at issue, namely, § 1396b (v). Rather, the dissent begs the question when it describes the scope of the hospitals' screening and stabilization obligations under EMTALA, and states that EMTALA no longer is applicable once a patient has been admitted to the hospital, either directly or through the emergency department.

Instead, we find persuasive the Arizona Supreme Court's explanation of the relationship between EMTALA and § 1396b (v), in *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* supra, 206 Ariz. 6 n.6. The Arizona court, in criticizing what it deemed to be the focus in *Greenery Rehabilitation Group, Inc.,* on stabilization rather than treatment; see footnote 15 of this opinion; stated that "whether a patient

this court and the Second Circuit, that the legislature did not intend to enact useless or superfluous legislation. See, e.g., *Lutwin* v. *Thompson*, 361 F.3d 146, 157 (2d Cir. 2004) ("[w]here possible, we avoid construing a statute so as to render a provision mere surplusage" [internal quotation marks omitted]); *Hatt* v. *Burlington*

---

is stable enough to be transferred from one health care facility to another is a consideration under . . . [EMTALA], which uses the same definition of 'emergency medical condition' as [§ 1396b (v) (3)] . . . . The concern under the EMTALA is a hospital's duty to treat patients coming to its emergency room. . . . That statute discusses stabilization of the patient with reference to when a hospital may transfer a patient to another facility. . . . However, § 1395dd does not indicate that an 'emergency medical condition' is no longer present when a patient is stable. Under the EMTALA, '[t]he term "stabilized" means, with respect to an emergency medical condition . . . that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility.' . . . Thus under the EMTALA, a patient is 'stabilized' if his or her condition will not materially deteriorate during the short time necessary to transfer the patient to another facility. But, under [§ 1396b (v)] . . . stabilization is not an express factor in determining whether an emergency medical condition exists." (Citations omitted.) *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* supra, 6 n.6.

Indeed, the appendicitis and cardiac bypass surgery examples cited by the dissent are illustrative of the distinction between EMTALA as a screening statute, and § 1396b (v) as a payment for treatment statute. With respect to appendicitis, the patient with an infected appendix is actually more at risk for death or serious complications as time passes before definitive treatment. After that patient is admitted to the hospital and time passes, however, EMTALA is no longer applicable. Thus, under the dissent's reading of § 1396b (v), that patient would not be eligible for medicaid reimbursement for the necessary emergency surgical treatment of an "emergency medical condition" because that patient would not have been discharged or transferred, but rather already would have been admitted to the hospital as an inpatient. Moreover, the dissent's apparent limitation of § 1396b (v) only to treatment rendered in the emergency room places a premium on the entrance to the hospital used by the patient, rather than that patient's actual medical condition that precipitated the hospitalization in the first instance. In our view, this result, as a product of the dissent's construction of § 1396b (v), is beyond irrational, and clearly inconsistent with the letter and purpose of § 1396b (v). Cf. *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* supra, 206 Ariz. 7 (noting "wide variety of emergency conditions or patients' responses to treatment").

*Coat Factory,* 263 Conn. 279, 309–10, 819 A.2d 260 (2003) ("[s]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted]).

In light of the foregoing cases, our review of the hearing officer's decision and the trial court's memorandum of decision demonstrates that they are the product of an improperly narrow application of the *Greenery Rehabilitation Group, Inc.,* standard. In the case before us, the plaintiff sought coverage for "the finite course of treatment of the very condition that sent him to the emergency room, and not for long-term or open-ended nursing care." *Luna* v. *Division of Social Services,* supra, 162 N.C. App. 11; id., 13 (remanding case for additional factual findings in case wherein undocumented immigrant had been diagnosed with non-Hodgkin's lymphoma). It is undisputed that the inquiry before the hearing officer was confined only to the initial chemotherapy treatments that the plaintiff received from his admission in November through December, 1998.[19] Furthermore, the record demonstrates that the plaintiff presented with symptoms of "intense pain, nausea and overall weakness so severe that he could take only one

[19] The dissent disagrees with our conclusion that the plaintiff sought only coverage for a " 'finite course of treatment' " because he subsequently received multiple additional chemotherapy treatments that ultimately did not cure his illness, stating that whether the plaintiff had an emergency medical condition should not depend on the hospital's billing practices. We disagree with the dissent's contention that our analysis is driven by the hospital's billing practices; in contrast, our focus on the compensability of the initial treatment rendered is the product of the limited scope of the plaintiff's claim herein. The subsequent chemotherapies simply are not before us, and we, therefore, need not consider them now. Moreover, there is nothing in the statute or interpretive case law remotely suggesting that whether a treatment ultimately is successful renders the nature of the underlying condition any more or less emergent.

to two steps before collapsing."[20] *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 53 (*Lavery, C. J.*, dissenting). It also is undisputed that the plaintiff's severe symptoms came on suddenly, as he testified that he "felt a little weak two weeks before but then . . . suddenly couldn't walk any more."

Moreover, there is nothing in the record that indicates that the plaintiff received anything other than the standard course of treatment after he was diagnosed with a "rapidly fatal" disease, which, in the words of the trial court, had "reached a crisis stage" when he arrived at the hospital. He, therefore, required "immediate medical treatment, without which the patient's physical well-being would likely be put in jeopardy or serious physical impairment or dysfunction would result." *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 233. The only medical evidence in the record that contains any analysis or explanation of the gravity of the plaintiff's medical condition is Erichson's letter describing acute myelogenous leukemia as, inter alia, a "rapidly fatal" disease.[21] See footnote 6 of this

---

[20] The plaintiff testified before the hearing officer that he went to his family physician in November, 1998, because: "I had trouble with my stomach, great pain. I vomited, had nausea. I could hardly walk, I took just one or two steps. Then I felt weak and was about to collapse." After taking blood samples and X rays, the plaintiff's family physician then referred him to Erichson, who immediately sent him to the hospital because he could not walk. Erichson then diagnosed the plaintiff with acute myelogenous leukemia, and hospitalized him through December, 1998.

[21] The hearing officer apparently relied on the medical review team's report stating that the plaintiff did not suffer from an emergency medical condition and that, "bone marrow biopsies and Hickman [catheter] insertion are not emergency events." As the plaintiff points out, this report is signed only by a social worker, and does not explain the medical credentials of the reviewing team. The denial also is conclusory, and does not explain why the biopsies and catheterization are not emergency events, or contradict Erichson's letter describing the "rapidly fatal" nature of the plaintiff's illness. Finally, it fails to consider the patient's condition, which is what defines the emergency nature of the procedures.

opinion. Inasmuch as "emergency medical conditions can involve a wide variety of injuries and illnesses that might require diverse treatment approaches"; *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 233;[22] and determination of the existence of an emergency medical condition "should largely be informed by the expertise of health care providers"; *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, supra, 206 Ariz. 8; we conclude that the hearing officer's determination that the plaintiff did not suffer from an emergency medical condition is the result of an improperly narrow application of the law.[23] See General Statutes § 4-183 (j) (4).[24] Accordingly, the Appellate Court improperly affirmed the judgment of the trial court dismissing the plaintiff's administrative appeal.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand

---

[22] In *Lewis* v. *Thompson*, supra, 252 F.3d 578, in concluding that illegal aliens were not entitled to nonemergency prenatal care under the medicaid act, the Second Circuit described Congress' understanding of the emergency medical condition definition: "In discussing the alienage restrictions in the bill, the House Conference Report emphasizes: 'The allowance for emergency medical services under [m]edicaid is very narrow. The conferees intend that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. The conferees do not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein.' H.R. Conf. Rep. No. 104-725, [p.] 380 (1996) . . . reprinted in 1996 U.S.C.C.A.N. 2649, 2768."

[23] We, therefore, need not reach the plaintiff's claim that the hearing officer's factual determination was not supported by substantial evidence.

[24] General Statutes § 4-183 (j) provides in relevant part: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (4) affected by other error of law . . . ."

the case to the trial court with direction to sustain the plaintiff's administrative appeal.

In this opinion BORDEN and PALMER, Js., concurred.

BORDEN, J., concurring. I agree with and join the well reasoned majority opinion. I write separately only to state that, if we were writing on a clean slate, it would be difficult for me to characterize the term "emergency medical condition," as used in 42 U.S.C. § 1396b (v) (3), as "plain and unambiguous," particularly as applied to the facts of this case. I also recognize, however, as does the majority opinion, that under our decision in *Webster Bank* v. *Oakley*, 265 Conn. 539, 554–55, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004), principles of comity and consistency counsel that we follow the lead of the United States Court of Appeals for the Second Circuit in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226, 233 (2d Cir. 1998), in its interpretation of this federal statute and its definition of "emergency medical condition" as used in 42 U.S.C. § 1396b (v) (3). Applying that definition to the facts of the present case, as well as for the other persuasive reasons stated by the majority, I agree that the judgment of the Appellate Court must be reversed.

SULLIVAN, C. J., with whom ZARELLA, J., joins, dissenting. The majority concludes that the Appellate Court improperly determined that the plaintiff, Zbigniew Szewczyk,[1] did not suffer from an emergency medical condition as that term is defined in Title XIX of

---

[1] After this appeal was filed, counsel for the plaintiff notified this court that the plaintiff had died. Subsequently, this court granted a motion to substitute Michael R. Kerin, the temporary administrator of Szewczyk's estate, as plaintiff. For convenience, references to the plaintiff in this dissenting opinion are to Szewczyk.

the Social Security Act, 42 U.S.C. § 1396b (v) (3).[2] See *Szewczyk* v. *Dept. of Social Services*, 77 Conn. App. 38, 52, 822 A.2d 957 (2003). Accordingly, the majority concludes that the plaintiff is entitled to medical assistance payments from the defendant, the department of social services (department), pursuant to state regulation. See Department of Social Services, Uniform Policy Manual, § 3005.05 (C) (Uniform Policy Manual).[3] In support of its conclusion, the majority relies heavily on the decision of the United States Court of Appeals for the Second Circuit in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, 150 F.3d 226 (2d Cir. 1998). I believe, however, that the standard for determining whether a person suffers from an emergency medical condition adopted by the court in *Greenery Rehabilitation Group, Inc.*, is both incorrect and unworkable. Accordingly, I would not follow that case. Instead, in light of the legislative history and genealogy of § 1396b (v) (3), I would conclude that that statute was intended to be construed consistently with the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (e) (1).[4] Applying that interpretation, I would

---

[2] Title XIX of the Social Security Act, 42 U.S.C. § 1396b (v) (3), provides: "For purposes of this subsection, the term 'emergency medical condition' means a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

"(A) placing the patient's health in serious jeopardy,

"(B) serious impairment to bodily functions, or

"(C) serious dysfunction of any bodily organ or part."

[3] Uniform Policy Manual, supra, § 3005.05 (C), provides that an alien who does not qualify as an eligible noncitizen "is eligible for [medical assistance] only, if he or she has an emergency medical condition."

[4] The Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (e), provides in relevant part: "(1) The term 'emergency medical condition' means—

"(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

"(i) placing the health of the individual . . . in serious jeopardy,

"(ii) serious impairment to bodily functions, or

"(iii) serious dysfunction of any bodily organ or part . . . ."

conclude that the plaintiff did not receive treatment for an emergency medical condition and, therefore, was not entitled to medical assistance payments from the defendant. Accordingly, I respectfully dissent.

I begin with a review of the relevant statutes and regulations. Medicaid law authorizes medical assistance payments from a state to an illegal alien only for medical care and services necessary for the treatment of an emergency medical condition. See Uniform Policy Manual, supra, § 3005.05 (C); see also 8 U.S.C. § 1621.[5] The Uniform Policy Manual, supra, § 3000.01 provides in relevant part: "A medical condition is considered an emergency when it is of such severity that the absence of immediate medical attention could result in placing the patient's health in serious jeopardy. This . . . does not include care or services related to an organ transplant procedure." Federal medicaid law provides payment by the federal government to the states for medical assistance provided to an illegal alien only if "such care and services are necessary for the treatment of an emergency medical condition"; 42 U.S.C. § 1396b (v) (2) (A); see also 8 U.S.C. § 1611 (b) (1) (A);[6] and defines

[5] Title 8 of the United States Code, § 1621, provides in relevant part: "(a) . . . Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not—

"(1) a qualified alien (as defined in [8 U.S.C. § 1641]),

"(2) a nonimmigrant under the Immigration and Nationality Act [8 U.S.C. 1011 et seq.], or

"(3) an alien who is paroled into the United States under section 212 (d) (5) of such Act [8 U.S.C. 1182 (d) (5)] for less than one year,

"is not eligible for any State or local public benefit (as defined in subsection [c] of this section).

"(b) . . . Subsection (a) of this section shall not apply with respect to the following State or local public benefits:

"(1) Assistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b [v] [3] of title 42) of the alien involved . . . ."

[6] Title 8 of the United States Code, § 1611, provides in relevant part: "(a) . . . Notwithstanding any other provision of law and except as provided in subsection (b) of this section, an alien who is not a qualified alien (as defined in [8 U.S.C. § 1641]) is not eligible for any Federal public benefit (as defined

" 'emergency medical condition' " as "a medical condition . . . manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1396b (v) (3). The United States Department of Health and Human Services (Department of Health and Human Services) has adopted an implementing regulation that adds to this definition the condition that the medical condition must be of "sudden onset." 42 C.F.R. § 440.255.[7]

There is no dispute in this case that the definition of emergency medical condition in the Uniform Policy Manual, supra, § 3000.01, is at least as broad as that contained in § 1396b (v) (3).[8] The parties also agree that

in subsection [c] of this section).

"(b) . . . (1) Subsection (a) of this section shall not apply with respect to the following Federal public benefits:

"(A) Medical assistance under title XIX of the Social Security Act [42 U.S.C. 1396b et seq.] . . . for care and services that are necessary for the treatment of an emergency medical condition (as defined in section 1903 [v] [3] of such Act [42 U.S.C. 1396b (v) (3)]) of the alien involved . . . ."

[7] Title 42 of the Code of Federal Regulations, § 440.255 (c) (1), provides that medical assistance payments are available for treatment of an illegal alien if "[t]he alien has, after sudden onset, a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:

"(i) Placing the patient's health in serious jeopardy;

"(ii) Serious impairment to bodily functions; or

"(iii) Serious dysfunction of any bodily organ or part . . . ."

[8] Both the plaintiff and the department point out that federal medicaid law sets certain minimum standards with which participating states must comply; see *Lewis* v. *Thompson*, 252 F.3d 567, 569 (2d Cir. 2001); and suggest that those minimum federal requirements include medical assistance payments for services provided to illegal aliens for treatment of an emergency medical condition as defined in § 1396b (v) (3). Neither party, however, points to any federal medicaid law *requiring* states to provide medical assistance to illegal aliens who receive treatment for an emergency medical condition. Section 1396b (v) (2) merely provides that the federal government

the state may provide more generous public benefits, including medical assistance, to illegal aliens than the benefits authorized by federal law only if it has enacted a law after August 22, 1996, providing for such benefits. See 8 U.S.C. § 1621 (d).[9] The Connecticut legislature has passed no such law. Thus, the parties agree that the definition of emergency medical condition in § 3000.01 of the Uniform Policy Manual, supra, is neither more restrictive nor broader than the definition set forth in the federal statute and regulation, which are themselves coextensive.

The parties disagree, however, as to whether the phrase emergency medical condition is broad enough to cover a medical condition that presents with severe symptoms and may require long-term treatment. Although the definition of the phrase may plainly and unambiguously cover certain acute medical conditions, such as a severe laceration, that can be resolved promptly with immediate treatment, it is not clear whether the phrase was intended to encompass a condition, such as the plaintiff's, that presents with severe symptoms but requires longer term treatment and, therefore, reasonably may be characterized as chronic.

will pay states for such medical assistance if it is provided. Because neither party disputes the issue, however, I assume that the definition of emergency medical condition set forth in the Uniform Policy Manual, supra, § 3000.01, is at least as broad as that set forth at § 1396b (v) (3).

[9] Title 8 of the United States Code, § 1621 (d), provides: "A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility."

Judge Lavery, in his dissenting opinion, argued that the definition in the Uniform Policy Manual, supra, § 3000.01, was broader than the federal statutory definition. *Szewczyk* v. *Dept. of Social Services*, supra, 77 Conn. App. 64–66. In his brief to this court, the plaintiff disavows any such claim. He points out that he did not argue to the Appellate Court that the state regulation was broader than the federal statute and, therefore, that he did not have occasion to bring 8 U.S.C. § 1621 (d) to the court's attention.

Thus, the text of the statute is ambiguous as applied in the present case. Accordingly, in construing § 1396b (v) (3), I do not believe that we are limited to the text of the statute, but may look to its genealogy and legislative history, to cases construing its language and to its relationship to other federal statutes and regulations.[10] See *In re Venture Mortgage Fund, L.P.*, 282 F.3d

---

[10] In *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 232–33, the United States Court of Appeals for the Second Circuit concluded that § 1396b (v) (3) is "plain in its meaning" and "clearly conveys" the commonly understood dictionary definition of "emergency" as "a sudden bodily alteration such as is likely to require immediate medical attention. . . . The emphasis is on severity, temporality and urgency." (Citation omitted; internal quotation marks omitted.) In my view, however, to define an emergency medical condition as a " '*sudden* bodily alteration such as is likely to require *immediate* medical attention' "; (emphasis added) id., 232; is merely to rephrase the problem. It is clear that terms such as "sudden," "acute," "emergency" and "immediate" are relative terms by their very nature. For example, in the present case, the plaintiff's symptoms were of sudden onset in comparison to the symptoms of a person who has had a congenital medical condition since birth, but were not sudden in comparison to an injury suffered in a knife fight. Indeed, although the majority agrees with the court in *Greenery Rehabilitation Group, Inc.*, that the phrase emergency medical condition is plain and unambiguous, it disagrees with the Appellate Court's conclusion that the plaintiff's condition was not sufficiently severe, short-lived and urgent to meet the standard in that case. I also note that federal courts construing § 1395dd (e) (1), which contains language identical to § 1396b (v) (3), have consulted that statute's legislative history. See footnote 19 of this dissenting opinion. Accordingly, I cannot agree with the court's conclusion in *Greenery Rehabilitation Group, Inc.*, that the phrase emergency medical condition is plain and clear in its meaning.

The majority concludes that, because "[t]he decisions of the Second Circuit Court of Appeals carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts"; (internal quotation marks omitted) *Webster Bank* v. *Oakley*, 265 Conn. 539, 555 n.16, 830 A.2d 139 (2003), cert. denied, 541 U.S. 903, 124 S. Ct. 1603, 158 L. Ed. 2d 244 (2004); it finds *Greenery Rehabilitation Group, Inc.*, to be "highly persuasive guidance . . . ." I note, however, that although the substantive decisions of the Second Circuit on questions of federal law are "entitled to great weight," we are not bound by those decisions. (Internal quotation marks omitted.) *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 329 n.20, 627 A.2d 909 (1993). I also note that, although the majority finds the portions of *Greenery Rehabilitation Group, Inc.*, that *support* its decision to be highly persuasive, it rejects the portions of the decision that *undermine* its decision. Specifically, it states that it is persuaded by the argument of the court in *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, 206 Ariz. 1, 6 n.6, 75 P.3d 91 (2003), that the court in *Greenery Rehabilitation Group, Inc.*, improperly deter-

185, 188 (2d Cir. 2002) (legislative history and other tools of interpretation may be relied upon if terms of federal statute are ambiguous).

The medicaid provision of which § 1396b (v) (3) is a part was enacted in 1986 in response to a ruling by the United States District Court for the Eastern District of New York; see *Lewis* v. *Gross*, 663 F. Sup. 1164 (E.D.N.Y. 1986), rev'd in part, *Lewis* v. *Thompson*, 252 F.3d 567 (2d Cir. 2001); that federal medicaid law placed no restriction on alien eligibility for medicaid assistance. See Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9406, 100 Stat. 1874, 2057–58 (1986), now codified at 42 U.S.C. § 1396b (v); H.R. Conf. Rep. No. 99-1012, 99th Cong., 2d Sess. 399 (1986), reprinted in 1986 U.S.C.C.A.N. 3868, 4044–45. Section 1396b (v) barred medicaid assistance to aliens not residing in the United States under color of law unless the alien suffered from an emergency medical condition. The legislative history of the Omnibus Budget Reconciliation Act of 1986 indicates that the general purpose underlying its disparate provisions was to reduce government expenditures. See generally 1986 U.S.C.C.A.N. 3868 et seq. The legislative history sheds no light, however, on the purpose of the specific provision permitting medicaid payments to the states for medical assistance to an illegal alien for an emergency medical condition or the scope and contours of that term.

A review of the genesis and evolution of the statutory language is instructive, however. The language defining emergency medical condition, as set forth in § 1396b (v) (3), first appeared in 42 C.F.R. § 447.53 (b) (4).[11] That

mined that stabilization is " 'an express factor in determining whether an emergency medical condition exists.' "

[11] Title 42 of the Code of Federal Regulations, § 447.53 (b) (4), defines "[e]mergency services" as "[s]ervices provided in a hospital, clinic, office, or other facility that is equipped to furnish the required care, after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in—

"(i) Placing the patient's health in serious jeopardy;

regulation, which was adopted in 1985, implemented a 1982 amendment to the federal medicaid provisions that prohibited the states from imposing cost sharing requirements on individuals who received emergency medical services "as defined by the Secretary . . . ." See Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 131, 96 Stat. 324, 367–68 (1982), codified at 42 U.S.C. § 1396o (b) (2) (D); see also 50 Fed. Reg. 23,009, 23,013 (May 30, 1985). In response to the amendment, the Department of Health and Human Services originally had adopted a regulation containing language identical to that set forth at 42 C.F.R. § 440.170 (e), pertaining to medical services that are covered by medicaid.[12] See 48 Fed. Reg. 5732 (February 8, 1983). When it adopted that language, the Department of Health and Human Services solicited comments from the public on whether the language should be revised for purposes of the cost sharing amendment. See id. In response to the comments that it received, the Department of Health and Human Services concluded that the language of the coverage regulation was "too limited" for the cost sharing regulation; 50 Fed. Reg., supra, 23,011; and adopted the current version of the regulation; see 42 C.F.R. § 447.53 (b) (4); which includes "services provided in settings other than the hospital." 50 Fed. Reg., supra, 23,011.

In 1986, Congress amended federal medicare law by enacting EMTALA, or the "patient dumping act." See Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. 99-272, § 1867, 100 Stat. 82, 166 (1986),

---

"(ii) Serious impairment to bodily functions; or

"(iii) Serious dysfunction of any bodily organ or part."

[12] Title 42 of the Code of Federal Regulations, § 440.170 (e), defines " '[e]mergency hospital services' " as services that "(1) Are necessary to prevent the death or serious impairment of the health of a recipient; and

"(2) Because of the threat to the life or health of the recipient necessitate the use of the most accessible hospital available that is equipped to furnish the services . . . ."

codified at 42 U.S.C. § 1395dd. The amendment's definition of emergency medical condition contained language substantially identical to the language of 42 C.F.R. § 447.53 (b) (4), with the exception that the statute did not list the facilities at which emergency medical services must be provided or include a sudden onset requirement. See 42 U.S.C. § 1395dd (e) (1). The amendment requires hospitals that participate in the federal medicare program to screen and stabilize patients who come to the hospital with an emergency medical condition, including illegal aliens, if the hospital is capable of doing so. The legislative history of the amendment indicates that it was intended to address the problem of the inappropriate transfer of "patients in life threatening situations" from the emergency rooms of private hospitals to public hospitals "for economic reasons alone . . . ." 131 Cong. Rec., Pt. 21, 28,568 (1985), remarks of Senator David Durenberger. The legislative history also indicates that the amendment was not intended to be a "cure-all," but a "modest policy"; id.; and was not intended to solve the "larger problem" of providing medical services to the growing number of uninsured patients. Id., 28,569, remarks of Senator Edward Kennedy. Finally, the legislative history indicates that the general accounting office was conducting a study to determine whether refinements in federal medicaid law would be required to advance the purposes of the act. Id., 28,568. Six months after Congress enacted § 1395dd, it enacted the medicaid provision at issue in the present case, § 1396b (v) (3), which uses substantially identical language to define emergency medical condition.[13]

---

[13] As I have indicated, § 1396b (v) was enacted in response to the decision of a United States District Court in July, 1986. See *Lewis* v. *Gross*, supra, 663 F. Sup. 1164. It is reasonable to conclude, however, that the exception to the ban on federal payment to the states for emergency medical services provided to illegal aliens, as set forth in § 1396b (v) (2), was included in the amendment in recognition of the enactment of § 1395dd six months earlier.

The Department of Health and Human Services expressly recognized the relationship between § 1396b (v) (3) and § 1395dd (e) (1) when, in 1990, it revised 42 C.F.R. § 440.255 (c) (1), which is the implementing regulation for § 1396b (v) (3). See 55 Fed. Reg. 36,816 (September 7, 1990). The Department of Health and Human Services stated that "we have revised the definition of emergency services to say . . . 'after the sudden onset of a medical condition . . . .' This change will make the definition of emergency services consistent with the definition already in use in the Medicaid program at 42 [C.F.R.] § 447.53 (b) (4) and with the definition contained in section 1867 (e) (1) of the [Omnibus Budget Reconciliation Act of 1985, codified at 42 U.S.C. § 1395dd (e) (1)], relating to hospital emergency [departments'] inappropriate failure to treat certain patients (the anti-dumping provision)."[14] 55 Fed. Reg., supra, 36,816.

This legislative background clearly suggests that § 1396b (v) (2) was intended to ensure that states and hospitals that participate in the medicare and medicaid programs will receive at least partial payment from the federal government for emergency medical services provided to indigent illegal aliens pursuant to § 1395dd.[15] Accordingly, it is clear to me that Congress

---

[14] Before the adoption of the final version of the regulation in 1990, set forth in 42 C.F.R. § 440.255, the proposed rule did not include the sudden onset requirement and was identical to the definition set forth in § 1395dd (e) (1), with the exception that the regulation expressly included emergency labor and delivery. See 53 Fed. Reg. 38,036 (September 29, 1988). Thus, the change made in 1990 did not *make* the medicaid regulation consistent with the medicare statute, but left the provisions substantially consistent.

[15] See also United States General Accounting Office, Report to Congressional Requesters, Undocumented Aliens: Questions Persist about Their Impact on Hospitals' Uncompensated Care Costs (May, 2004) pp. 5–6, 9–10 (costs of providing illegal aliens with emergency medical services pursuant to § 1395dd are covered in part by medicaid provisions applying to illegal aliens). Because not all indigent illegal aliens who receive treatment for an emergency medical condition under § 1395dd are eligible for medical assistance for such treatment under § 1396b (v) (2), some of the costs of

intended for the phrase emergency medical condition, as defined in § 1396b (v) (3), to have the same scope and contours as that phrase is defined in § 1395dd (e) (1) and for the phrase "care and services . . . necessary for the treatment of an emergency medical condition" as used in § 1396b (v) (2) (A) to refer to the treatment required by § 1395dd.[16] Accordingly, in construing § 1396b (v) (3), I believe that we should be guided by the meaning of § 1395dd (e) (1).

The meaning of § 1395dd (e) (1) is determined in part by its relationship to the other provisions of § 1395dd.[17]

providing the treatment mandated by § 1395dd to illegal aliens are uncompensated.

[16] Indeed, the plaintiff in the present case does not argue that § 1396b (v) (3) should be given a broader interpretation than § 1395dd (e) (1). Rather, the plaintiff *assumes* that § 1395dd mandated the treatment of his leukemia and argues that the statutes are coextensive. The department argues that, even if § 1395dd mandated such treatment, § 1396b (v) (3) has a *narrower* meaning than § 1395dd (e) (1) because it relates to payment, not treatment. I see no basis for such a proposition in the language or legislative history of § 1396b (v) (3). In any event, I need not address the department's claim because I would conclude that § 1395dd did not mandate the plaintiff's medical treatment.

[17] Title 42 of the United States Code, § 1395dd, provides in relevant part:
"(b) Necessary stabilizing treatment for emergency medical conditions and labor

"(1) In general

"If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

"(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

"(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section. . . .

"(c) Restricting transfers until individual stabilized

"(1) Rule

"If an individual at a hospital has an emergency medication condition which has not been stabilized . . . the hospital may not transfer the individual unless . . .

"(A) . . . (ii) . . . the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . .

As I have indicated, the primary purpose of § 1395dd was to prohibit the inappropriate transfer of patients who arrive at a hospital with an emergency medical condition "such that the absence of immediate medical attention could reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy . . . ." 42 U.S.C. § 1395dd (e) (1) (A). The statute imposes two basic obligations on participating hospitals: (1) to screen patients who come to a hospital's emergency department; 42 U.S.C. § 1395dd (a); and (2) to stabilize patients suffering from an emergency medical condition. 42 U.S.C. § 1395dd (b). Subsection 1395dd (e) (3) (A) defines " 'to stabilize' " as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur *during the transfer of the individual from a facility* . . . ." (Emphasis added.) Once a medical condition has been stabilized, the provisions of the statute prohibiting transfer of the patient no longer apply. See 42 U.S.C. § 1395dd (c) (1).

Accordingly, read as a whole, the statutory language indicates that the phrase "immediate medical attention" as used in the definition of " 'emergency medical condition' "; 42 U.S.C. § 1395dd (e) (1) (A); refers to the stabilizing treatment described in § 1395dd (e) (3) (A) and that the phrase "material deterioration of the condi-

---

"(e) Definitions . . .

"(3) (A) The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph (1) (A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . .

"(4) The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by . . . the hospital . . . ."

See footnote 4 of this dissenting opinion for the text of 42 U.S.C. § 1395dd (e) (1) (A), defining emergency medical condition.

tion" as used in § 1395dd (e) (3) (A) refers to the adverse results listed in § 1395dd (e) (1) (A) (i), (ii) and (iii). Thus, an emergency medical condition is a condition that requires stabilizing treatment in order to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility or his discharge.[18] Moreover, because the term to stabilize is defined entirely in terms of the treatment required in order to transfer an individual safely to another facility; see 42 U.S.C. § 1395dd (e) (3) (A); it is apparent that, if no transfer or discharge is contemplated, the treatment provisions of the statute do not apply.

This interpretation of § 1395dd is consistent with the interpretation of the Department of Health and Human Services. Title 42 of the Code of Federal Regulations, § 489.24 (d) (2), is in the portion of the medicare regulations specifying "the basic commitments and limitations that [a health care] provider must agree to as part of an agreement to provide services." 42 C.F.R. § 489.2. Section 489.24 (d) (2) of 42 C.F.R. provides: "(i) If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition [definition substantially identical to definition in § 1395dd (e) (1)], and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual." When it adopted the current version of this regulation, the Department of Health and Human Services stated that it had received

---

[18] As I discuss later in this opinion, § 1395dd does not impose a requirement that the patient must be fully cured before discharge. A discharge complies with the statute even if the patient may need long-term inpatient treatment at some later date and at another facility, as long as the patient has been stabilized to the point that it is not reasonably likely that his condition will materially deteriorate before he can secure such treatment.

several comments requesting clarification on whether § 1395dd would "apply to inpatients who are stable but who are scheduled for inpatient surgery for an emergency medical condition, such as patients who need an angiogram or bypass surgery, after seeing their physician for chest pain. One commenter requested clarification on the issue of individuals directly admitted to the hospital for an emergency medical condition, for example, appendicitis, although the individual is not seeking emergency services from the hospital." 68 Fed. Reg. 53,246 (September 9, 2003). The Department of Health and Human Services responded that "once an individual has been admitted as an inpatient (including individuals who have been directly admitted as inpatients upon presentation to the hospital), EMTALA no longer applies"; id.; unless the individual was admitted for the purpose of evading the requirements of the statute. Id., 53,245.

In support of this interpretation, the Department of Health and Human Services cited several federal cases that have concluded that "the statute requires that stabilizing care must be provided in a way that avoids material deterioration of an individual's medical condition *if the individual is being transferred from the facility.*" (Emphasis added.) Id., 53,244; see, e.g., *Bryan* v. *Rectors & Visitors of the University of Virginia*, 95 F.3d 349 (4th Cir. 1996).[19] "The courts gave great weight to

---

[19] In *Bryan* v. *Rectors & Visitors of the University of Virginia*, supra, 95 F.3d 350, the plaintiff's decedent had been transferred to the defendant hospital for treatment of an emergency medical condition, respiratory distress. The hospital treated the plaintiff's decedent for twelve days and then determined, pursuant to its internal procedures and against the wishes of her family, that no further efforts to prevent her death should be taken and entered a " 'do not resuscitate' " order. Id. The plaintiff's decedent died eight days later. Id. The plaintiff brought an action in the United States District Court for the Eastern District of Virginia claiming that the hospital's refusal to resuscitate the decedent was a failure to stabilize her in violation of § 1395dd. The court dismissed the action, concluding that the statute imposed no obligation on the hospital after the patient had been admitted. Id.

On appeal, the United States Court of Appeals for the Fourth Circuit affirmed the judgment of the District Court and rejected the plaintiff's inter-

## the fact that hospitals have a discrete obligation to stabilize the condition of an individual when moving

pretation that "every presentation of an emergency patient to a hospital covered by EMTALA obligates the hospital to do much more than merely provide immediate, emergency stabilizing treatment with appropriate follow-up. Rather, without regard to professional standards of care or the standards embodied in the state law of medical malpractice, the hospital would have to provide treatment indefinitely—perhaps for years—according to a novel, federal standard of care derived from the statutory stabilization requirement." Id., 351. Instead, the court concluded that "EMTALA is a limited anti-dumping statute, not a federal malpractice statute. . . . Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat. . . . Numerous cases and [EMTALA's] legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons." (Citations omitted; internal quotation marks omitted.) Id.

The court also stated that "[o]nce EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt. That being the legal reality, there is no justification for [the] assertion [of the plaintiff's decedent] that, under such a reading of EMTALA, a hospital could simply treat for a few days or hours and then refuse treatment if they could not stabilize quickly and cheaply. . . . Such refusal of treatment after the establishment of a physician-patient relationship would be regulated by the tort law of the several states. See, e.g., 61 Am. Jur. 2d, Physicians, Surgeons and Other Healers, § 234 ([T]he relation of physician and patient, once initiated, continues until it is ended by the consent of the parties . . . or until his services are no longer needed, and until then the physician is under a duty to continue to provide necessary medical care to the patient.), § 238 (Failure of the patient to pay for the physician's services does not justify the physician in abandoning the patient while he still is in need of medical attendance . . . .) (1981). And, EMTALA is quite clear that it is not intended to preempt state tort law except where absolutely necessary." (Citation omitted; internal quotation marks omitted.) *Bryan* v. *Rectors & Visitors of the University of Virginia*, supra, 95 F.3d 351–52.

The court then cited the language of § 1395dd (e) (3) (A) and concluded that "[t]he stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment." Id., 352; see also *Harry* v. *Marchant*, 291

that individual out of the hospital to either another facility or to his or her home as part of the discharge process. Thus, should a hospital determine that it would be better to admit the individual as an inpatient, such a decision would not result in either a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA." 68 Fed. Reg., supra, 53,244. The Department of Health and Human Services also stated that "[t]he courts have generally acknowledged that this limitation on the scope of the stabilization requirement does not protect hospitals from challenges to the decisions they make about patient care; only that redress may lie outside EMTALA. For example, a hospital may face liability for negligent behavior that results in harm to persons it [treats] after they are admitted as inpatients, but such potential liability would flow from medical malpractice principles, not from the hospital's obligations under EMTALA." Id.

This interpretation of § 1395dd (e) (1) is also consistent with the interpretation of the Centers for Medicare and Medicaid Services (CMS), an agency within the Department of Health and Human Services, which is responsible for investigating complaints alleging violations of § 1395dd. See United States General Accounting

---

F.3d 767, 771 (11th Cir. 2002) (42 U.S.C. § 1395dd does not impose guidelines for care and treatment of patient who is not transferred); *Bryant* v. *Adventist Health System/West*, 289 F.3d 1162, 1168 (9th Cir. 2002) (statutory stabilization requirement ends when individual is admitted for inpatient care); *Correa* v. *Hospital San Francisco*, 69 F.3d 1184, 1190 (1st Cir. 1995) (to establish EMTALA violation, patient must show that hospital turned away, discharged or transferred patient without first stabilizing emergency medical condition); *Brooker* v. *Desert Hospital Corp.*, 947 F.2d 412, 415 (9th Cir. 1991) (statute requires only that hospital refrain from transferring patient until patient is stabilized); *Estate of Rivera* v. *Doctor Susoni Hospital, Inc.*, 288 F. Sup. 2d 161, 166 (D.P.R. 2003) (when hospital neither transferred nor discharged patient there can be no violation of statutory duty to provide treatment necessary to assure that no material deterioration would occur during transfer); *Torres Nieves* v. *Hospital Metropolitano*, 998 F. Sup. 127, 133 (D.P.R. 1998) ("[w]hile EMTALA imposes a duty to stabilize a patient, it does not impose a duty to fully cure an emergency condition before transferring or discharging a patient").

Office, Report to Congressional Committees, Emergency Care: EMTALA Implementation and Enforcement Issues (June, 2001) p. 1. In 2001, Congress directed the United States general accounting office to examine the effect of the statute on hospitals and physicians who serve emergency departments. Id. During the course of the investigation, the general accounting office learned that hospitals and physicians were uncertain about the amount of care they were required to provide to comply with the statutory requirements and at what point their treatment obligations ended. Id., p. 15. The general accounting office asked CMS: (1) "[w]hether the determination that a patient is stable for transfer or discharge ends the hospital's EMTALA obligation or whether the hospital must also ensure follow-up care is provided"; and (2) "[w]hether a hospital must ensure that follow-up care is obtained." Id., p. 16. CMS advised the general accounting office that: (1) "[t]he requirement is fulfilled when a physician determines the patient is stable for transfer or stable for discharge. The regulations on transfer requirements refer to patients who are unstable; therefore they do not apply when a patient is stable for transfer or stable for discharge"; and (2) "[h]ospitals are not required to ensure that follow-up care is obtained." Id. Guidelines issued by CMS state that "[a]n individual is considered stable and ready for discharge when, within reasonable clinical confidence, it is determined that the individual has reached the point where his/her continued care, including diagnostic work-up and/or treatment, could be reasonably performed as an outpatient or later as an inpatient, provided the individual is given a plan for appropriate follow-up care as part of the discharge instructions. The [emergency medical condition] that caused the individual to present to the dedicated [emergency department] must be resolved, but the underlying medical condition may persist. Hospitals are expected within reason to assist/provide dis-

charged individuals the necessary information to secure the necessary follow-up care to prevent relapse or worsening of the medical condition upon release from the hospital . . . ." Memorandum from the Director, Survey and Certification Group, Centers for Medicare & Medicaid Services, to State Survey Agency Directors re: Revised Emergency Medical Treatment and Labor Act (EMTALA) Interpretive Guidelines (May 13, 2004), p. 37 (CMS Memorandum), available at http://www.cms.hhs.gov/Medicaid/survey-cert/sc0434.pdf.

With this background in mind, I would conclude that the phrase emergency medical condition as used in § 1395dd (e) (1) (A) means a condition requiring stabilization in order to avoid a material deterioration of an individual's condition during the course of a transfer to another facility or during discharge.[20] As I have indicated, if no transfer or discharge is contemplated, or if the discharge takes place after admission for inpatient treatment, then the treatment provisions of § 1395dd (b) (1) do not apply. As I have also indicated, I believe that the phrase emergency medical condition as used in both § 1396b (v) (3) and the Uniform Policy Manual, supra, § 3000.01, was intended to be coextensive with the phrase as used in § 1395dd (e) (1) (A). Accordingly, if stabilization is not required or if no transfer or discharge is contemplated, then any treatment received by the individual does not fall within the scope of § 1396b (v) (2) (A) and the individual is not eligible for medical assistance under the Uniform Policy Manual, supra, § 3005.05 (C).[21]

---

[20] As I have indicated, if a discharge is contemplated and follow-up care is required, § 1395dd requires only that the hospital stabilize the individual's condition to the extent that it will not materially deteriorate before follow-up care can be secured. See CMS Memorandum, supra, p. 37. It does not require the hospital to provide treatment necessary to assure that no material deterioration of the individual's condition will *ever* occur.

[21] The majority states that my "extensive discussion" of EMTALA "does *not provide any insight with respect to the kind of emergency medical conditions that Congress intended would be subject to the specific statute*

This interpretation not only is consistent with the genealogy and legislative history of § 1396b (v) (3), but it also advances general federal policy. Federal law provides that illegal aliens are ineligible for state and local governments public benefits; see 8 U.S.C. § 1621 (a); unless the state specifically enacts a law providing for such benefits after August 22, 1996. See 8 U.S.C. § 1621 (d). There are a small number of narrowly defined exceptions to this law, including one authorizing states to provide "[a]ssistance for health care items and services that are necessary for the treatment of an emergency medical condition (as defined in section 1396b [v] [3] of title 42) of the alien involved . . . ." 8 U.S.C. § 1621 (b) (1). The legislative history of § 1621, which was enacted as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (1996) (Welfare Reform Act), indicates that Congress understood the allowance for emergency services under § 1396b (v) (3) to be "very narrow" and to apply "only . . . to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit."[22] H.R. Conf.

at issue, namely § 1396b (v)" and that I "[beg] the question" when I conclude that EMTALA no longer applies after a patient has been admitted to the hospital. The flaw in this criticism is that it incorrectly assumes that I have not established as a preliminary matter that Congress enacted § 1396b (v) to advance the purposes of EMTALA; see 131 Cong. Rec., supra, 28,568; and that Congress intended the meaning of emergency medical condition as used in § 1396b (v) to be consistent with the meaning of the phrase as used in § 1395dd (e) (1). See 55 Fed. Reg., supra, 36,816. These conclusions require me to determine the meaning of the phrase as used in § 1395dd (e) (1), hence my "extensive discussion" of that statute. Because my analysis establishes beyond dispute that EMTALA does not apply after a patient has been admitted to the hospital, it necessarily follows that § 1396b (v) does not apply. I see nothing circular or elliptical about this reasoning.

[22] The legislative history also indicates that the exception authorizing testing and treatment of communicable diseases for illegal aliens; see 8 U.S.C. § 1621 (b) (3); was intended "only [to] apply where absolutely necessary to prevent the spread of such diseases. This is only a stop-gap measure until the deportation of a person or persons unlawfully here. It is not intended

Rep. No. 104-725, 104th Cong., 2d Sess. 380 (1996), reprinted in 1996 U.S.C.C.A.N. 2649, 2768. The legislative history of the Welfare Reform Act also indicates that one of its principal purposes was to "reduce the size and scope of the Federal Government and to provide tax relief for working American families." H.R. Rep. No. 104-651, 104th Cong., 2d Sess. 10 (1996), reprinted in 1996 U.S.C.C.A.N. 2183, 2191. As I have indicated, that was also a primary purpose of the Omnibus Budget Reconciliation Act of 1986, of which § 1396b (v) (3) was a part. Moreover, when Congress enacted the Welfare Reform Act, it explicitly stated that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601 (6). It is apparent that a narrow, clearly delineated definition of emergency medical condition, such as that contained in § 1395dd, would advance these policies far more effectively than a definition broad enough to cover the type of treatment provided to the plaintiff in the present case.[23]

to provide authority for continued treatment of such diseases for a long term." H.R. Conf. Rep. No. 104-725, 104th Cong., 2d Sess. 379–80 (1996), reprinted in 1996 U.S.C.C.A.N. 2649, 2767–68. This further supports the view that Congress did not intend to authorize full treatment of an emergency medical condition if such treatment is not necessary to safely discharge or transfer the patient.

[23] When the Department of Health and Human Services revised the definition of emergency services in 42 C.F.R. § 440.255 (c) (1), it stated that "we believe the broad definition allows States to interpret and further define the services available to aliens covered by [§ 1396b (v) (2)] which are any services necessary to treat an emergency medical condition in a consistent and proper manner supported by professional medical judgement. Further, the significant variety of potential emergencies and the unique combination of physical conditions and the patient's response to treatment are so varied that it is neither practical nor possible to define with more precision all those conditions which will be considered emergency medical conditions." 55 Fed. Reg., supra, 36,816. In my view, this language merely recognizes that the definition of emergency medical condition is broad in the sense that it applies to a wide variety of conditions requiring stabilizing treatment. Clearly, it would be impossible to catalogue all such conditions. The definition is not broad, however, in the sense that it authorizes an expansive course of treatment for each such condition.

Moreover, EMTALA is the only law *mandating* the *treatment* of an illegal alien's emergency medical condition. Section 1396b (v) merely *authorizes payment* to the states for the treatment of an emergency medical condition after it has been provided. I cannot conceive of any reasons why Congress would require hospitals to provide treatment to an uninsured person who is suffering from an emergency medical condition only to the extent required to stabilize the person for discharge or transfer but then—only months later and using identical language—authorize payment for the treatment of an illegal alien's emergency medical condition for as long as the underlying condition persists. The effect of giving such a broad reading to § 1396b (v) would be to limit the application of the narrow definition in § 1395dd to uninsured citizens and legal aliens. Moreover, I find it unlikely that Congress would simultaneously make illegal aliens ineligible for state and local public benefits in order to discourage illegal immigration; see 8 U.S.C. §§ 1601 (6) and 1621 (a); and authorize states to provide a benefit to illegal aliens that is not provided to uninsured citizens.[24] See 8 U.S.C. § 1621 (b) (1).

The majority concludes, however, that § 1396b (v) (3) is broad enough to cover the treatment of any severe medical condition if the withholding of prompt treat-

---

[24] I recognize that, even under my reading of § 1396b (v) (3), illegal aliens receive a benefit that uninsured citizens do not, namely, medical assistance payments for treatment of an emergency medical condition to the extent required to stabilize the patient for transfer or discharge. Uninsured citizens are assured of receiving such treatment under § 1395dd, but my research reveals no provision authorizing medical assistance payments for such treatment if the patient is not covered by medicaid. Under a broad reading of § 1396b (v) (3), however, an illegal alien would receive not only this narrow benefit, but would also receive treatment and reimbursement for conditions that, if suffered by an uninsured citizen, would not even entitle the citizen to treatment. For example, I am aware of no medicaid or medicare provision that even arguably would entitle an uninsured citizen to the treatment that the plaintiff in the present case received or to reimbursement for such treatment.

ment would be reasonably likely to cause the individual's death or place his health in serious jeopardy and if the condition can be resolved with a finite course of treatment. In support of that conclusion, it relies primarily on *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 226,[25] and on a number of state court cases construing the term emergency medical condition as used in § 1396b (v) (3) or in substantially identical state regulations implementing the statute. See *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* 206 Ariz. 1, 75 P.3d 91 (2003); *Diaz* v. *Division of Social Services,* 166 N.C. App. 209, 600 S.E.2d 877 (2004), review granted, 359 N.C. 320, 611 S.E.2d 409 (2005); *Medina* v. *Division of Social Services,* 165 N.C. App. 502, 598 S.E.2d 707 (2004); *Luna* v. *Division of Social Services,* 162 N.C. App. 1, 589 S.E.2d 917 (2004); see also *Gaddam* v. *Rowe,* 44 Conn. Sup. 268, 271–73, 684 A.2d 286 (1995) (illegal alien entitled to medicaid assistance for ongoing dialysis treatment under § 1396b [v] [2]). In none of those cases, however, did the court consider the relationship between § 1396b (v) and § 1395dd.[26] See 131 Cong. Rec., supra, 28,568 (sug-

---

[25] See footnote 10 of this dissenting opinion.

[26] The court in *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* supra, 206 Ariz. 6 n.6, did recognize that the definition set forth in § 1395dd (e) (1) is identical to the definition in § 1396b (v) (3), but concluded that the stabilization requirement of § 1395dd (e) (1) was not a factor under § 1396b (v) (3). The court failed, however, to examine the legislative history of the statutes and, therefore, failed to discover that § 1396b (v) (3) was enacted only months after the enactment of § 1395dd and that the definitions were intended to be consistent.

The majority states that it finds "persuasive the Arizona Supreme Court's explanation of the relationship between EMTALA and § 1396b (v)" in *Scottsdale Healthcare, Inc.* The majority does not deny, however, that the legislative history and genealogy of § 1396b (v) indicate that the statute was enacted in response to the enactment of § 1395dd and was intended to be consistent with § 1395dd. It states only that it is constrained from looking at that legislative background because the court in *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 233, failed to do so.

gesting that refinements in federal medicaid law would be required to advance purposes of EMTALA); 55 Fed. Reg., supra, 36,816 (expressly recognizing that definition of emergency medical condition in § 1396b [v] was intended to be consistent with definition in § 1395dd). Instead, the courts relied primarily on the dictionary definitions of several terms used in the statute and on the general expertise of health care providers on the question of when an emergency medical condition exists. See footnote 10 of this dissenting opinion; see also, e.g., *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, supra, 7–8 (citing dictionary definitions of " 'acute' " and " 'chronic' " and concluding that when emergency medical condition has ended "should largely be informed by the expertise of health care providers").[27] Accordingly, I do not find the cases persuasive.[28]

Moreover, the rule set forth in *Greenery Rehabilitation Group, Inc.* v. *Hammon*, supra, 150 F.3d 233, and adopted by the majority is impossible to implement in any principled way. The majority implicitly recognizes that there are medical conditions that place an individual's health in serious jeopardy and are likely to result in serious impairment to bodily functions or of a bodily organ or part, but that do not come within § 1396b (v) (3) because they cannot be resolved with a "finite course of treatment." *Luna* v. *Division of Social Services*, supra, 162 N.C. App. 11. In other words, serious and even life threatening conditions that require an

[27] See also *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration*, supra, 206 Ariz. 8 (rejecting claim that stability is primary criterion of emergency medical condition under § 1396c [v]); id., 8 n.9 (term " 'immediate' " as used in statute "contemplates a range of time frames, as opposed to some fixed standard").

[28] I do not dispute that the expertise of health care providers has a role in determining whether an emergency medical condition exists. That expertise, however, cannot be exercised in a vacuum, but must be guided by the proper legal standard.

immediate but indefinite or unending course of treatment are not emergency medical conditions. It is apparent, however, that it is frequently impossible to determine at the time of admission, or, indeed, at any given point during treatment, if and when a particular condition will be fully resolved. If a patient suffers a serious traumatic head injury and the termination of medical treatment at any point during the remainder of the patient's life would result in immediate death or serious injury, to characterize the injury as either acute or chronic would be arbitrary. The injury is acute in the sense that it was of sudden onset and is severe, and it is chronic in the sense that it cannot be resolved with a finite course of treatment.[29] It is also clear that many indisputably chronic diseases have acute phases.

---

[29] The majority may respond that, for a condition to be acute, it must be sudden, severe *and* resolvable with a finite course of treatment. My point, however, is that the phrase "finite course of treatment"; *Luna v. Division of Social Services*, supra, 162 N.C. App. 11; is not susceptible to principled definition. In the case of a head injury, for example, any determination that treatment of the acute injury has terminated and treatment of the chronic condition has commenced necessarily will be arbitrary. The court in *Greenery Rehabilitation Group, Inc. v. Hammon*, supra, 150 F.3d 232, attempted to resolve this dilemma by suggesting that an emergency medical condition ends when the patient is "stabilized and the risk of further direct harm from [the] injuries [is] essentially eliminated." The court rejected the District Court's conclusion that the patients in that case were suffering from emergency medical conditions because "the absence of continuous medical attention could reasonably be expected to place their health in serious jeopardy." Id., 233. The Court of Appeals reasoned that, even if it could be established that the patients' health would be jeopardized by the absence of immediate medical attention, they were not suffering from emergency medical conditions because their medical conditions were not manifested by acute symptoms. Id. In my view, this reasoning is circular. The patients were receiving long-term medical treatment *because* the termination of the treatment would result immediately in acute symptoms which would then require emergency medical treatment. Thus, in the absence of the legislative evidence indicating that § 1396b (v) (3) was intended to be interpreted consistently with § 1395dd (e) (1), I would agree with the majority that the court in *Greenery Rehabilitation Group, Inc.*, improperly concluded that whether the patients had been stabilized was a dispositive factor in determining whether they suffered from emergency medical conditions.

Under the majority's decision, whether such injuries and conditions constitute emergency medical conditions under § 1396b (v) (3) will depend " 'largely,' " which is to say, entirely, on their characterization by medical experts unguided by anything except the vague and ambiguous language of the statute. See *Scottsdale Healthcare, Inc.* v. *Arizona Health Care Cost Containment System Administration,* supra, 206 Ariz. 8.

The majority concludes in the present case that the plaintiff had an emergency medical condition because he was diagnosed with a " 'rapidly fatal' " disease that had " 'reached a crisis stage' " when he arrived at the hospital and because he received a " 'finite course of treatment . . . .' " There is no evidence in the record, however, that the treatment for which the plaintiff seeks reimbursement cured his disease or that he did not require ongoing outpatient treatment or additional hospital admissions after his discharge.[30] Indeed, the record

---

[30] Thus, the majority does not follow its own holding that the "determination of the existence of an emergency medical condition should largely be informed by the expertise of health care providers . . . ." (Citation omitted; internal quotation marks omitted.) It points to no medical evidence on the question of whether a medical condition is acute or chronic when it is rapidly fatal if untreated and, if treated, long-term and incurable. This description appears to apply to the condition of the patients in *Greenery Rehabilitation Group, Inc.* v. *Hammon,* supra, 150 F.3d 233, which the court found to be chronic.

The majority states that "there is nothing in the statute or interpretive case law remotely suggesting that whether a treatment ultimately is successful renders the nature of the underlying condition any more or less emergent." My point, however, is not that the treatment must be ultimately successful. Indeed, under my interpretation, I do not believe that to be the case. Rather, my point is that, because the open-ended treatment of a patient's chronic condition can always be broken down arbitrarily into multiple finite courses of treatment, there is no principled way under the majority's interpretation to distinguish between a serious chronic condition and an emergency medical condition. The majority also states that its "focus on the compensability of the initial treatment rendered is the product of the limited scope of the plaintiff's claim . . . ." To the extent that the majority suggests that, under its interpretation, an *unlimited* claim probably would not be compensable, I do not find that limitation on the scope of § 1396b (v) (3) to be particularly helpful. The majority simply has failed to articulate the principle that it believes limited the plaintiff's claim.

suggests otherwise. See footnote 1 of this dissenting opinion. Accordingly, the majority's conclusions that the plaintiff's condition was not chronic and that he received a " 'finite course of treatment' " ultimately rest on the mere fact that the hospital handled the medical treatment that he received during his admission as a discrete course of treatment for billing purposes.

If our only guide to the meaning of the phrase emergency medical condition were the ambiguous language of § 1396b (v) (3), I might find tolerable an outcome based on the vagaries of hospital billing practices. Courts must do the best they can when confronted with an inherently ambiguous statute and no additional evidence of legislative intent. *Because* the statute is inherently ambiguous, however, we are not limited to its express terms in construing its meaning, but may consider its legislative background. In my view, that legislative background establishes that Congress intended the statute to be construed consistently with § 1395dd (e) (1).

I would conclude that, in order to establish his eligibility for payments under the Uniform Policy Manual, supra, § 3005.05 (C), the plaintiff was required to establish that his condition was such that he could not have been transferred or discharged safely and that the treatment for which he seeks medical assistance payments actually was provided in order to assure, within a reasonable medical probability, that no material deterioration of his condition would occur during the course of his transfer to another facility or during discharge. Although the hearing officer made no factual findings on these issues, the plaintiff does not claim and there is no suggestion in the record that the treatment provided to the plaintiff was intended to stabilize him for transfer to another facility or for discharge so that he could secure the appropriate follow-up care. Rather, the record clearly indicates that the plaintiff was admitted

immediately into the hospital as an inpatient for long-term treatment.[31] I would conclude, therefore, that the plaintiff was not eligible for medical assistance under the Uniform Policy Manual, supra, § 3005.05 (C). Accordingly, although I believe that the Appellate Court applied an improper standard, I would conclude that the impropriety was harmless and that its judgment should be affirmed.

---

[31] The trial court found that the plaintiff was admitted to the hospital's emergency room. The portion of the hospital record cited by the court states, however, that the plaintiff "was directly admitted to [Stamford Hospital] for continuous course of [chemotherapy]." I have carefully reviewed the rest of the record and have discovered no evidence that the plaintiff was admitted to the emergency room. Even if he was, however, there is no evidence that he received stabilizing treatment there for the purpose of transferring him to another facility or discharging him.

I do not, as the majority states, suggest either that § 1396b (v) applies only to treatment provided in the emergency room or that all treatment provided in an emergency room is emergency medical treatment under the statute. Rather, as I have repeatedly stated, I would conclude that the statute applies to treatment provided for the purpose of stabilizing a patient's condition so that he may be safely transferred or discharged, regardless of where that treatment takes place. The majority finds this result "beyond irrational, and clearly inconsistent with the letter and purpose of § 1396b (v)." The "letter" of § 1396b (v) (3), however, is identical to the "letter" of § 1395dd (e) (1), which indisputably means what I have said it means. As to the "purpose" of § 1396b (v), I see nothing in the majority's opinion indicating what it believes that purpose is beyond authorizing payment for the treatment of an emergency medical condition. In contrast, my analysis shows that the underlying purpose of the statute was to advance the purposes of EMTALA. My interpretation of § 1396b (v) (3), unlike the majority's, accomplishes that purpose.